IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JNP ENTERPRISES, L.L.C. | Case No. 2:13-cv-04684 |
| *Plaintiff/Counter-Defendant* | Judge Jane Triche Milazzo |
| V. | Magistrate Judge Karen Wells Roby |
| PATTERSON STRUCTURAL MOVING AND SHORING, L.L.C. & 120 WEST PARTNERS, L.L.C. | |
| *Defendants/Counter-Plaintiffs* | |

**FIRST AMENDED AND SUPPLEMENTAL COUNTER-CLAIM OF PATTERSON STRUCTURAL MOVING AND SHORING, L.L.C. & 120 WEST PARTENERS, L.L.C.**

NOW INTO COURT, through the undersigned counsel, comes Defendants/Counter-Plaintiffs, Patterson Structural Moving and Shoring, LLC ("PSMS") and 120 West Partners, LLC ("120 West") (hereinafter referred to as "Counter-Plaintiffs") and supplements and amends their Original Counter-Claim as follows:

1. By adding Paragraph 8 to Section II. Parties as follows:

    8. Charles Johnson, as an individual, who is a citizen of the State of Florida.

2. By amending Paragraph 12 of Section III. Facts, as follows:

    12. Exhibit No. 1 of the Act of Sale is a non-exclusive list of equipment which represented part of the value 120 West was purchasing from JNP. JNP, through Charles Johnson, warranted that the items listed in Ex. No. 1 were free and clear of any encumbrances and/or liens.

"Seller warrants that the non-exclusive items listed below are owned free and clear of any encumbrances and/or liens by PSMS."

3. By amending Paragraph 21 of Section III. Facts, as follows:

21. JNP and specifically Charles Johnson, misrepresented the business structure of PSMS to gain an advantage over 120 West in an attempt to induce the sale of PSMS to 120 West.

4. By amending the title of Section IV, as follows:

**IV. CAUSES OF ACTION AGAINST JNP ENTERPRISES, LLC AND CHARLES JOHNSON**

5. By amending Paragraph 56 of Section IV, as follows:

56. All of the previous paragraphs of each of the foregoing Sections are incorporated in this count.

6. By amending Paragraph 58 of Count II of Section IV, as follows:

58. At all pertinent times, JNP and Charles Johnson knew or should have known of the outstanding invoices and that PSMS was operating illegally.

7. By amending Paragraph 59 of Count II of Section IV, as follows:

59. At all pertinent times, JNP and Charles Johnson knew or should have known that PSMS was misreporting and under reporting its employees' classifications to its worker's compensation insurer.

8. By amending Paragraph 60 of Count II of Section IV, as follows:

60. At all pertinent times, JNP and Charles Johnson knew or should have known that PSMS was avoiding the pending worker's compensation audit.

9. By amending Paragraph 61 of Count II of Section IV, as follows:

61. JNP's misrepresentations and omissions by Charles Johnson were used to gain an unfair advantage over 120 West to induce 120 West into the sale of PSMS.

10    By amending Paragraph 62 of Count II of Section IV, as follows:

62.    120 West would not have entered into the Act of Sale if not for JNP's misrepresentations and omissions by Charles Johnson.

11.    By amending Paragraph 63 of Count II of Section IV, as follows:

63.    As a result of JNP's misrepresentations and omissions by Charles Johnson, 120 West and PSMS have suffered or will suffer substantial damages.

12.    By adding COUNT THREE as follows:

**COUNT THREE - <u>ADDITIONAL BREACHES OF CONTRACT</u>**

64.    **<u>Article 1.11 -</u>** Article 1.11 states that, "Parties agree to share the monthly costs related to the equipment storage yard on an equal basis until the termination of the lease period of 18 months."

65.    On or about August 1, 2013, JNP informed PSMS that JNP would no longer make any further payments for the utilities pursuant to the aforementioned lease.

66.    On August 14, 2013, PSMS made demand upon JNP for the monthly payments but to no avail.

67.    PSMS seeks reimbursement of these monies.

68.    **<u>Article 1.5.2 -</u>** Article 1.5.2 sets forth the procedure for JNP to make certain payments to PSMS for the ten (10) HMGP projects identified therein.

69.    Pursuant to Article 1.5.2.2.2,

.2    Seller shall pay to Buyer additional payments representing forty (40%) of the total sums due for each individual project upon verification by Seller of foundation wall and/or perimeter wall completion, and upon receipt by Seller of conditional and/or final lien waivers (depending upon whether the specific subcontractor has finished work on the project or still must perform additional work) from Buyer from all subcontractors for work performed to date on such individual project.  Seller shall make an initial

      inspection of all projects listed above within seven (7) days of the Closing Date to determine status of said projects and whether foundation wall and/or perimeter wall portions of such project have been completed.  Seller shall then make payments accordingly within three (3) business days to Buyer upon verification and receipt of documents identified in this paragraph.  Seller shall make further inspections within five (5) business days upon notice by Buyer.

    .3  Following verification set forth in section (.2) above, Seller shall pay remaining sums due within three (3) business days (representing twenty (20%) percent of the total amount due) upon receipt by Seller of payment from appropriate state or other agencies or payors, contingent upon receipt from Buyer of all final lien releases from any and all subcontractors who performed work for Buyer on each project.  Further, Buyer hereby agrees to provide a bond against any lien filed by any subcontractor engaged by Buyer.

70.  In its motion to deposit funds with the Court (Doc. 34-1), JNP declares that it received final payments in the amount of $64,230.80 on the following projects:

    2113 E. Christie;
    35566 Terance;
    2025 Farragut; and
    132 Prairie View

71.  To date, PSMS has completed all work pursuant to Article 1.5.2 of the Act of Sale.

72.  To date, pursuant to the Act of Sale, JNP has failed to make final payments to PSMS.

73.  Upon information and belief, as of January 31, 2014, JNP has received $119,393.66 in final funds pursuant to Article 1.5.2 of the Act of Sale.

74.  Upon information and belief, as of January 31, 2014, HMGP has issued final payment to the homeowners, ready for pick-up by JNP, in the amount of $18,820.80.

75. PSMS seeks the specific performance of JNP to turn over all final payments to PSMS pursuant to the Act of Sale.

76. **Article 3.2 -** Article 3.2 states that,

> **3.2** Seller agrees that the Buyers assume no liability for monies owed to, promised to, or for which payment is contemplated to, Jeremy Patterson, by the Seller through its own relationship to and with Jeremy Patterson.

77. Upon the termination of Jeremy Patterson's employment with PSMS, it was discovered that Jeremy Patterson entered into a lease with Dr. Bert Bratton for a term of Aril 27, 2012 to April 30, 2013 for rents in the amount of $2,700.00 per month in the name of PSMS.

78. On April 4, 2013, PSMS terminated the employment of Jeremy Patterson leaving nearly two years remaining on the lease.

79. Upon termination, Mr. Patterson informed PSMS that PSMS, through Charles Johnson, agreed to pay his rent under the aforementioned lease.

80. On reason and belief, JNP and Charles Johnson were fully aware that the aforementioned lease was made in the name of PSMS but omitted this fact to 120 West during the negotiation period.

81. On reason and belief, JNP agreed to pay the lease of Jeremy Patterson as part of his employment and/or involvement with PSMS.

82. Pursuant to Article 3.2, PSMS is not liable for any "monies owed to, promised to, or for which payment is contemplated to, Jeremy Patterson."

83. In an effort to mitigate damages, PSMS entered into a settlement agreement with Dr. Bratton to terminate the lease that named PSMS as the lessee.

84. PSMS seeks the money expended to terminate the aforementioned lease in the amount of $17,300.00 plus the associated attorney fees.

85. **Article 5.10 -** Article 5.10 states that,

> **5.10 Non-Solicitation:** Seller agrees that for a period of one (1) year following the Closing of this Agreement, he shall not directly or indirectly contact or solicit potential customers for whom PSMS has a signed LOI, as identified in the attached Exhibit "4". This prohibition shall not preclude Seller from performing work for any person on such list if Seller does not, directly or indirectly, initiate contact with such identified potential client. Seller further agrees for a period of one (1) year following the Closing of this Agreement not to directly or indirectly solicit a present PSMS employee for the purpose of causing such employee to terminate his employment with PSMS. This provision shall not prohibit or preclude Seller from providing employment to such employee, however, but only in the case of an employee's termination from PSMS with the first year following the Effective Date  Violation of the provisions of this paragraph shall entitle the Company to recover from Contractor LIQUIDATED DAMAGES in the amount of $5,000.00. Seller further agrees that the provisions of this Article shall apply to Seller regardless of whether Seller acts for himself or on behalf of any corporation, limited liability company, partnership, association, joint venture or otherwise. In the event of a breach of the provisions of this Article, Seller further agrees to pay all reasonable collection costs, including reasonable attorney's fees for the collection of LIQUIDATED DAMAGES pursuant hereto.

86. On or about May 2, 2013, Ms. Dorris Williams informed PSMS that she was terminating her employment with PSMS.

87. Upon information and belief, Ms. Williams was, in fact, working in some capacity for JNP and/or an affiliated business entity while still employed by PSMS.

88. On or about May 28, 2013, Ms. Williams sent an email associated with Duckie Johnson, the business of Mr. Charles Johnson's father. At this time, Ms. Williams represented to Freshbooks that she was the account owner and not PSMS.

89. Pursuant to Art. 5.10, PSMS seeks liquidated damages in the amount of $5,000.00 as a result of the breach of the non-solicitation clause.

90. On or about August 9, 2013, PSMS and JNP entered into a Consent Preliminary Injunction (Doc. 26-1).

91. Paragraph 9 of the Consent Preliminary Injunction states that JNP would provide certain photocopies to PSMS.

> 9. JNP shall provide the Defendants a photocopy of the back of each check collected and/or received by JNP as "Old AR" and/or promissory note payments under the Act of Sale until all "Old AR" and/or promissory note payments are received and/or collected.

92. On September 11, 2013, PSMS, through undersigned counsel, demanded the photocopies from JNP through their counsel.

93. To date, JNP has failed to provide to PSMS any of the aforementioned photocopies.

94. PSMS seeks the specific performance of JNP to provide the photocopies pursuant to Paragraph 9 of the Consent Preliminary Injunction.

95. **Article 4.8 -** Article 4.8 states,

> **4.8** Parties agree that all taxes to include company, payroll and others incurred and due by the existing entity PSMS and/or Gulf Coast Lift LLC as it may relate to activities associated with, contracted to, or cross-collateralized with PSMS, preceding the purchase or subsequent to purchase as relates to uncollected earnings that are anticipated to be received subsequent to purchase, are the sole responsibility of the Seller. Buyer and PSMS remain liable for all other tax obligations arising out of or related to PSMS.

96. On or about December 11, 2013, PSMS received a Notice of Levy on Wages, Salary, and Other Income from the IRS.

97. The lien is for monies owed during the tax periods of 2010 and 2011 for a total amount of $180,403.18.

98. Upon information and belief, JNP, including Charles Johnson, knew or should have known of the amounts identified in the December 11, 2013 notice.

99. During the negotiation period, Mr. Johnson failed to disclose the existence of the tax debt to 120 West.

100. JNP's misrepresentations and omissions were used to gain an unfair advantage over 120 West to induce 120 West into the sale of PSMS.

101. 120 West would not have entered into the Act of Sale if not for JNP's misrepresentations and omissions.

102. As a result of JNP's misrepresentations and omissions, 120 West and PSMS have suffered or will suffer substantial damages.

103. Article 5.12 of the Act of Sale incorporates the listed Exhibits.

104. **EXHIBIT 1 OF THE ACT OF SALE -** Exhibit 1 of the Act of Sale is a non-exclusive list of the movables 120 West acquired in the sale of PSMS. JNP warranted that all equipment identified on Exhibit 1 or located within the equipment yard were free and clear of any encumbrances and/or liens.

105. In June, 2012, while attempting to obtain a line of credit, PSMS discovered four UCC filings encumbering PSMS equipment.

106. Two of the UCC filings identified Gulf Coast Lift, LLC as the secured party and the other two identified unknown third-parties as the secured parties.

107. Upon information and belief, JNP, including Charles Johnson, knew or should have known of the foregoing encumbrances.

108. On June 28, 2013, at the hearing on JNP's motion for preliminary injunction, Mr. Charles Johnson admitted that he knew that there were UCC filings encumbering PSMS movables.

> Q. Are you aware of any UCC filings that list PSMS as a debtor and Gulf Coast Lifts as a secured party?
> A. I'm sorry?
> Q. Are you aware of any UCC feelings that list PSMS as a debtor and Gulf Coast Lift as the secured party?
> A. Yes. (Doc. 33, Page 51, lines 13-18).

109. During the negotiation period, Mr. Johnson failed to disclose the existence of UCC filings to 120 West.

110. JNP's misrepresentations and omissions by Mr. Charles Johnson were used to gain an unfair advantage over 120 West to induce 120 West into the sale of PSMS.

111. 120 West would not have entered into the Act of Sale if not for JNP's misrepresentations and omissions.

112. As a result of JNP's misrepresentations and omissions, 120 West and PSMS have suffered or will suffer substantial damages.

113. In an attempt to mitigate damages, on or about August 13, 2013, PSMS filed requests to cancel the UCC filings.

114. Because JNP's failure to disclose the UCC filings, PSMS application for a line of credit was substantially delayed. As a result, PSMS was directly prevented from exploring business opportunities in New Jersey and Texas which prevented PSMS from experiencing millions of dollars in potential contracts.

115. As a result of JNP's refusal to timely remove the two UCC filings, PSMS experienced attorneys fees associated with removing the encumbrances.

13. By adding COUNT FOUR, as follows:

### COUNT FOUR - <u>INTENTIONAL BREACH OF CONTRACT</u>

### TAX RETURNS

116. Under Article V of the Act of Sale, JNP was required to file the tax returns for the year 2012 and the interim of 2013 on behalf of PSMS.

117. On May 9, 2013, by certified letter, PSMS demanded JNP to provide information to PSMS as to the status of the tax returns.

118. On June 26, 2013, PSMS filed its Original Counter-Claim against JNP demanding that JNP file the returns and/or provide copies of the returns to PSMS (Doc. 22).

119. On August 2, 2013, PSMS, through undersigned counsel, notified JNP's counsel that PSMS had received several tax notices from the IRS.

> "I know we briefly touched on the tax returns and UCC issues yesterday, but I need to stress the importance of discussing this issues as soon as possible. Please get with Charlie and give me a call Monday or Tuesday to discuss. The UCCs are holding up PSMS from getting a line of credit and are damaging the company. Also, PSMS most recently received multiple tax notices from the IRS. Hopefully, we can mitigate any potential or future damages by addressing these issues early next week. Thanks and talk to you soon."

120. On August 5, 2013, PSMS, through undersigned counsel, requested JNP's counsel for an update on the status of the tax returns.

> "Did you get a chance to talk to CJ, re: Taxes and UCC? Thanks."

121. On August 6, 2013, PSMS, through undersigned counsel, provided tax notices from the IRS to JNP's counsel.

> "As for the tax issue, please see attached correspondence from the IRS. We need to address this ASAP. Please advise if JNP is going to assist

with this matter or if he is choosing to wait for the trial. As we all know, once a company is flagged by the IRS, trouble is going to pursue. "

122. On August 8, 2013, PSMS, through undersigned counsel, identified the articles of the Act of Sale that required JNP to file the tax returns at issue.

123. On August 8, 2013, JNP's counsel informed the undersigned counsel that she forwarded the tax return requests to JNP.

124. On August 14, 2013, PSMS, through undersigned counsel, requested JNP, through its counsel, to address the tax issues immediately.

125. On September 11, 2013, PSMS, through undersigned counsel, requested JNP, through its counsel, to address the tax issues.

> "TAX RETURNS. Still no word on this issue? It has been nearly three (3) months and PSMS is still receiving notices from the IRS."

126. On October 24, 2013, PSMS, through undersigned counsel, informing JNP, through its counsel, that no response has been made to the tax requests of PSMS.

127. To date, PSMS has not received any type of confirmation as to whether the tax returns for 2012 or the interim tax return for 2013 were filed with the IRS.

128. JNP's failure and unwillingness to file the tax returns with the IRS is malicious and willful tortuous conduct in an attempt to force PSMS out of business.

129. JNP is fully aware of the ramifications for failing to file tax returns with the IRS and that PSMS is ultimately the party at risk for the failure thereof.

## UCC FILINGS

130. **EXHIBIT 1 OF THE ACT OF SALE -** Exhibit 1 of the Act of Sale is a non-exclusive list of the movables 120 West acquired in the sale of PSMS. JNP warranted

that all equipment identified on Exhibit 1 or located within the equipment yard were free and clear of any encumbrances and/or liens.

131.    Under Article 1.12 of the Act of Sale, Gulf Coasts Lift, LLC intervened and released all debts of PSMS to Gulf Coasts Lift, LLC.

> **1.12   Current PSMS Liabilities to Gulf Coast Lift, LLC:** Gulf Coast Lift, LLC hereby intervenes and agrees and does release and cancel the debts and obligations of PSMS to Gulf Coast Lift, LLC as shown on Exhibit 5.

132.    In June, 2012, while attempting to obtain a line of credit, PSMS discovered four UCC filings encumbering PSMS equipment.

133.    Two of the four UCC filings identified Gulf Coast Lift, LLC as the secured party.

134.    On June 28, 2013, at the hearing on JNP's motion for preliminary injunction, Mr. Charles Johnson admitted that he knew that there were UCC filings encumbering PSMS movables.

    Q.    Are you aware of any UCC filings that list PSMS as a debtor
          and Gulf Coast Lifts as a secured party?
    A.    I'm sorry?
    Q.    Are you aware of any UCC feelings that list PSMS as a debtor
          and Gulf Coast Lift as the secured party?
    A.    Yes. (Doc. 33, Page 51, lines 13-18).

135.    On July 2, 2013, by e-mail, PSMS, through undersigned counsel, forwarded copies of the four (4) UCC encumbrances to JNP's counsel requesting the cancellations thereof.

> "Attached please find the UCC filings. PSMS needs the filings terminated in order to extend their line of credit. Please review and advise on Mr. Johnson's position. Thank you."

136. On August 2, 2013, by e-mail, PSMS, through undersigned counsel, requested JNP's counsel to address the UCC filings.

> "I know we briefly touched on the tax returns and UCC issues yesterday, but I need to stress the importance of discussing this issues as soon as possible. Please get with Charlie and give me a call Monday or Tuesday to discuss. The UCCs are holding up PSMS from getting a line of credit and are damaging the company. Also, PSMS most recently received multiple tax notices from the IRS. Hopefully, we can mitigate any potential or future damages by addressing these issues early next week. Thanks and talk to you soon."

137. On August 5, 2013, by e-mail, PSMS, through undersigned counsel, requested JNP's counsel for an update regarding the UCC filings.

138. On August 6, 2013, by e-mail, PSMS, through undersigned counsel, followed-up with JNP's counsel by requesting an update concerning the UCC filings.

> "As for the UCCs, this is also an issue that needs to be immediately addressed. Like CJ is worried about his bonding capacity, our ability to obtain a line of credit is being hampered by these filings. Please advise how JNP wants to address this matter."

139. In an attempt to mitigate damages, on or about August 13, 2013, PSMS filed requests to cancel the UCC filings.

140. JNP's failure and unwillingness to cancel the two UCC filings in a timely manner is malicious and willful tortuous conduct in an attempt to force PSMS out of business.

141. Despite JNP being fully aware of the necessity and importance of establishing a line of credit in this field of business, JNP failed to make any effort in removing the encumbrances timely.

142. Because JNP's failure to remove the UCC filings, PSMS application for a line of credit was substantially delayed. As a result, PSMS was directly prevented from

exploring business opportunities in New Jersey and Texas which prevented PSMS from experiencing millions of dollars in potential contracts.

143. As a result of JNP's refusal to remove its UCC filings, PSMS experienced attorneys fees associated with removing the encumbrances.

## TITLE AND REGISTRATION TO EQUIPMENT

144. Under Article 1.6 of the Act of Sale, JNP was to deliver original titles of all PSMS vehicles to 120 West.

> 1.6 Title to Movables: Seller shall deliver original titles of all Company motor vehicles and other Company titled movable equipment and vehicles to Buyer.

145. On May 9, 2013, by certified letter, PSMS demanded JNP to provide the title to a Peterbilt Flatbed.

146. On June 26, 2013, PSMS filed its Original Counter-Claim against JNP demanding JNP to produce the original title to the Peterbilt Flatbed to PSMS (Doc. 22).

147. On October 21, 2013, by e-mail, PSMS, through undersigned counsel, requested JNP's counsel to provide title to the Peterbilt Flatbed.

> There is one issue that has been ignored throughout this matter that I want to bring to your attention. The issue of the title to the Peterbilt truck. The title was never turned over to PSMS as required by the act of sale. As a result, PSMS has not enjoyed the benefit of using this truck. In an effort to mitigate these damages, please consult with JNP regarding the title to the truck. Please advise if we can get this squared away without the assistance of the court.

148. In response, on October 21, 2013, JNP's counsel represented that JNP delivered the title at issue to Mr. Jeremy Patterson, who JNP alleged was an agent of PSMS. Therefore, JNP took the position that it met its obligation of turning over the title.

149. Jeremy Patterson was never an agent 120 West or the new PSMS.

150.    Paragraph 1.8 of the Act of Sale stipulates that, "At any time and from time to time after the Effective Date, at the other Party's request and without further consideration, a Party shall promptly execute and deliver such instruments and take all such other action reasonably requested to effectuate and implement this Agreement and to evidence the transfer of interests set forth herein."

151.    In the October 21, 2013 response e-mail, JNP's counsel also stated that JNP would execute any documents needed to obtain a replacement title if the original was lost.

152.    On October 24, 2013, by e-mail, PSMS, through undersigned counsel, requested JNP's counsel to complete a vehicle application and attached the form to the e-mail.

153.    To date, PSMS has not received the title to the Peterbilt Flatbed.

154.    JNP's failure and unwillingness to provide the title to the Peterbilt Flatbed is malicious and willful tortuous conduct in an attempt to damage PSMS.

14.    By renumbering paragraph 65 of the Original Counter-Claim as paragraph 155.

15.    By supplementing Section V. Damages, as follows:

156.    In addition, PSMS and 120 West seek damages pursuant to La. Civ. Code article 1997.

157.    In addition, PSMS and 120 West seek damages pursuant to La. Civ. Code article 1998.

158.    In addition, PSMS and 120 West seek liquidated damages in the amount of $5,000.00 pursuant to Article 5.10 of the Act of Sale.

159. In addition, PSMS and 120 West seek all profits they did not experience because of the fraud and/or breaches of contract perpetrated by JNP and Charles Johnson.

160. In addition, PSMS and 120 West seek the recoupment of monies paid for additional security due to JNP and Charles Johnson's failure to disclose UCC filings to Counter-Plaintiffs.

161. In addition, PSMS and 120 West seek the recoupment of any and all penalties paid by PSMS to the IRS pursuant to Articles 4.1, 4.2 and 4.8 of the Act of Sale.

## VI.   PRAYER

WHEREFORE, Patterson Structural Moving and Shoring, L.L.C. and 120 West, L.L.C., pray that upon a final trial and hearing hereof, they have judgment in their behalf, together with costs of court, against Plaintiff/Counter Defendants JNP Enterprises, L.L.C. and Charles Johnson for actual damages, pre- and post-judgment interest at the maximum rate allowed by law, costs of court, attorney's fees, consequential damages, unforeseen damages, specific performance and all other and further relief, general and special, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

/s/ Jeffrey M. Siemssen
**ALBERT J. NICAUD, #19261**
**JEFFREY M. SIEMSSEN, #31965**
Nicaud & Sunseri, L.L.C.
3000 18th Street
Metairie, Louisiana 70002
(504) 837-1304 - office
(504) 833-2843 - facsimile
Attorneys for Patterson Structural Moving
and Shoring, L.L.C. & 120 West Partners, L.L.C.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record either by hand delivery or by placing a copy of the same in the United States Mail, postage prepaid, and correctly addressed, this 4th day of February, 2014.

      /s/ Jeffrey M. Siemssen
        Jeffrey M. Siemssen